*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* SCHIEBER-BURNS, Minors.

UNPUBLISHED
August 10, 2026
1:03 PM

No. 378281
Kent Circuit Court
Family Division
LC Nos. 25-051320-NA;
25-051321-NA

Before: BOONSTRA, P.J., and YOUNG and KOROBKIN, JJ.

PER CURIAM.

Respondent appeals by right the initial adjudicatory order of the trial court in this child protective proceeding regarding her minor children RSB and JSB. Respondent contends that the trial court erred by exercising jurisdiction over the children. For the reasons that follow, we disagree and therefore affirm.

## I. BACKGROUND AND FACTS

In April 2025, respondent called Children's Protective Services (CPS) regarding her concern that the children, who were one and two years old, had been sexually abused and drugged by their father, paternal grandmother, and paternal aunt. Respondent also expressed her belief that the children were being used to create child pornography in their paternal grandmother's basement and that she had found child pornography featuring the children on the "dark web." CPS investigator Lisa Leavenworth was assigned to investigate respondent's allegations. Respondent initially indicated to CPS that she would make an appointment for the children to be medically examined and that she did so; however, Leavenworth discovered that the appointment never occurred. When Leavenworth followed up with respondent, respondent indicated that no appointment had been made because she was afraid that people related to the children's father were following her because of her discovery of his child pornography ring on the "dark web."

Later, respondent set up the appointment for the children to get examined, telling the forensic nurse examiner that she could tell that something had been inside of the children and that nearly three-year-old RSB had told her that "God is in her heart and [JSB's] heart, and daddy is in her tummy," but respondent did not provide further details. When respondent arrived at the

appointment, she immediately demanded to see the nursing licenses of the nurse examiners, asked "if any witchcraft or black magic was occurring in the nurse examiner program," and further mentioned a "dark energy" in the room. Respondent also refused to allow the children to go back to the examination rooms and instead insisted that the examinations occurred in the waiting room with her present. While the nurse examiners attempted to explain to respondent that the examination had to occur in an examination room rather than the waiting room, respondent "rebuked Satan" several times and when the children attempted to open the cabinets on a play kitchen, she gently removed their hands, at one point, waiving her hand and saying "[d]emons, be gone." Eventually, the nurse examiners left the waiting room to gather consent forms to review with respondent, and determined that they were concerned about respondent's mental health and whether she was capable of providing consent for the examinations. However, when they returned to the waiting room, they were informed that respondent had left with the children. The nurse examiners then called Leavenworth to express their concern for respondent's mental state and how it affected her ability to parent safely.

Leavenworth then went to respondent's home in an attempt to gather information about the sexual-abuse allegations and to assess the safety of the children; however, respondent refused to cooperate and would not allow CPS inside. The children were then removed, for the first time, from respondent's care because of concerns regarding her mental stability and CPS's inability to assess the children's safety. Once the children were removed, the children were examined and RSB was interviewed. The examinations revealed no signs of sexual abuse, and neither child disclosed any sexual abuse. Ultimately, CPS determined that respondent's allegations that their father and their paternal relatives were sexually abusing RSB and JSB were unsubstantiated and closed the case.

In August 2025, the children were returned to respondent under a stipulated 50/50 custody order with their father that also required respondent to engage in therapy. However, just three days after the children were returned, respondent refused to turn over the children to their father pursuant to the custody arrangement and also refused to allow anyone to check on the children's well-being. CPS then again received additional allegations that respondent's mental health was affecting her ability to care for the children.

CPS investigators Emily Knapp and Leavenworth then went to respondent's home to attempt to communicate with respondent and assess the situation. Knapp and Leavenworth saw respondent putting the children in her car, approached respondent in her driveway, and told her that there was an additional investigation regarding concerns about her mental health. Respondent then responded that what had been reported was "fake" and again insisted that CPS investigate the children's father about his sexual abuse of the children. Respondent, exhibiting rapid and disorganized speech, also mentioned that she believed that the father, the Grand Rapids Police Department (GRPD), and CPS were involved in a sex-trafficking ring and threatened to call the FBI. Although neither Leavenworth nor Knapp saw the children with any physical injuries or experiencing distress, respondent's mental state was a concern, so they requested an emergency pickup order.

Later that same day, the emergency pickup order was authorized, and Knapp and Leavenworth returned to respondent's home with the police to pick up the children. Respondent refused to let the police and CPS execute the order, and instead insisted that the order was fake,

despite receiving a copy of it. She told the police that they needed to call a SWAT team if they wanted to enter the house. At some point, respondent moved away from the front door, and a police officer reached through an open window and unlocked the front door. Respondent then came to the door and continued yelling and trying to stop the police officers and CPS investigators from entering the home. The police pushed inside, and respondent started toward the kitchen. The police followed respondent, and respondent "braced herself on the frame of the door with both of her hands and attempted to kick" the officer who followed. After a struggle, the officers placed respondent in handcuffs and took her into custody. The officers then attempted to walk respondent to their police car; however, respondent continued to fight and kick to avoid getting in the car. The officers eventually placed respondent into the car, and during the short ride to the jail, respondent calmed down significantly and started praying and even asked the officers to pray with her.

While the officers were struggling with respondent, Knapp and Leavenworth found RSB and JSB and attempted to shield them from seeing respondent's interactions with the police; however, the children were in a position to observe what happened before the officers, Knapp, and Leavenworth were able to get into the house. JSB was crying and "very upset" but allowed Knapp to pick him up after Knapp asked JSB a couple times if he wanted to go to his father's house. When Leavenworth asked RSB if she wanted to go to her father's house, RSB immediately said yes and allowed Leavenworth to pick her up. Leavenworth and Knapp then drove the children to their father's house. During the drive, RSB began making several unprompted statements, including apologizing to Knapp and Leavenworth, and repeatedly stating, "I'm so sorry, this is all my fault," for the entire 10-minute drive. When Knapp asked RSB why she felt that it was her fault, RSB did not answer, but eventually stated, "[M]ommy is sick." In addition, at some point, JSB began to copy RSB and also started muttering, "this is all my fault."

Both RSB and JSB were then dropped off at their father's house and remained in their father's care for the duration of the underlying proceeding. Respondent was arrested and placed in jail after being charged with resisting and obstructing.

The next day, the Department of Health and Human Services filed its petition in this case, requesting that the trial court authorize the petition, take jurisdiction over the children, and order the children removed from respondent's custody and care. The petition recounted the earlier discussed sequence of events dating back to April 2025 and through the events of the children's second removal from respondent's care in August 2025. In addition, the petition alleged that respondent informed CPS that she had called the FBI because "the allegations against her were fake and made up by the government" and because CPS was "working with the [GRPD] and [father] to sex traffic her children." The petition further alleged that when the police removed the children, respondent "paced continuously, at times yelling, and was unable to regulate her emotions" and had " 'wild eyes,' rarely blinked, and displayed pressured speech." The petition also alleged that, at about the same time that the children were removed for the second time, respondent posted on social media "bizarre rants alluding to sex[-]trafficking rings." The trial court authorized the petition.

In October 2025, an adjudication bench trial was held. Respondent testified first, explaining that she had called the FBI a couple times, including in August 2025, because she "felt like [CPS] was not taking my concerns about the safety of my children under their father's care seriously," but at the time of trial, that she was gaining trust in CPS's investigation. At trial, the

concerns that respondent specified regarding father were that the children were being neglected and had poor hygiene, and she denied claiming that her children were part of a sex-trafficking ring. Respondent admitted to making posts on social media concerning her theories about sex trafficking after her children were removed but initially stated that she was an advocate for victims and was not necessarily speaking about her own children. After being shown one of the videos, respondent equivocated, stating that she was not referring to her own children being taken by CPS as trafficking but that she was insinuating that there was corruption, which leads to trafficking. Respondent also explained that she did not open the door when the police came in August 2025 because there was no court order and that she perceived the contact as intimidation in response to her raising concerns about her children's safety. Respondent theorized that the children's father and her mother "painting [respondent] as mentally unwell" had to do with an inheritance that respondent was owed by her mother and that there was "money at play" in the investigation by the authorities and the judicial system.

Following testimonies from CPS investigators Knapp and Leavenworth, the nurse examiners who examined the children, and a police officer who assisted with the second removal, the trial court found that there was a statutory ground to take jurisdiction because respondent's actions were influenced by her unsubstantiated beliefs and those actions posed a substantial risk of harm to the children's mental well-being. Accordingly, the trial court entered an order of adjudication assuming jurisdiction over both children.

This appeal follows.

## II. STANDARD OF REVIEW

In child protective proceedings, we review the trial court's "decision to exercise jurisdiction . . . for clear error in light of the court's findings of fact." *In re Kellogg*, 331 Mich App 249, 253; 952 NW2d 544 (2020) (quotation marks and citation omitted). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).

## III. ANALYSIS

Respondent contends that the trial court erred when it exercised jurisdiction over the minor children. We disagree.

"Child protective proceedings are generally divided into two phases: the adjudicative and the dispositional." *In re Brock*, 442 Mich 101, 108; 499 NW2d 752 (1993). In the adjudicative phase, a court determines whether it may exercise jurisdiction over the children. *Id*. "Jurisdiction over a minor child is acquired by trial, plea of admission, or plea of no contest." *In re PAP*, 247 Mich App 148, 153; 640 NW2d 880 (2001). At trial, the petitioner must establish by a preponderance of evidence one of the statutory grounds from MCL 712A.2(b) as alleged in the petition it filed requesting that the court take jurisdiction. MCR 3.972(C)(1); *In re Ferranti*, 504 Mich 1, 15; 934 NW2d 610 (2019). A preponderance of evidence is defined as evidence that, "when weighed with that opposed to it, has more convincing force and the greater probability of truth." *People v Cross*, 281 Mich App 737, 740; 760 NW2d 314 (2008). Again, this Court should

give deference to the trial court's assessment of witness credibility because of its "special opportunity to observe the witnesses." *Kellogg*, 331 Mich App at 253 (quotation marks and citation omitted); see also *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009). And "the trial court must examine the child[ren]'s situation at the time the petition was filed." *In re MU*, 264 Mich App 270, 279; 690 NW2d 495 (2004).

"The purpose of child protective proceedings is the protection of the child . . . ." *Brock*, 442 Mich at 107. At the same time, the adjudicative phase "is of critical importance because the procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation of their parental rights." *In re Sanders*, 495 Mich 394, 406; 852 NW2d 524 (2014) (cleaned up).

In the present case, after an adjudicative bench trial, the trial court determined that it would exercise jurisdiction over the minor children pursuant to MCL 712A.2(b)(1). That statute provides, in pertinent part, that a trial court has

> [j]urisdiction in proceedings concerning a juvenile under 18 years of age found within the county:
>
> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for [their] health or morals, who is subject to a substantial risk of harm to [their] mental well-being, who is abandoned by [their] parents, guardian, or other custodian, or who is without proper custody or guardianship.

Here, the trial court did not find that respondent physically neglected the children; instead, the trial court found that the concerns about respondent's mental health and her decision-making posed a substantial risk of harm to the children's mental well-being. In making this determination, the trial court relied on the testimonies of a police officer, CPS investigators, and nurse examiners regarding their interactions with respondent, as well as the testimonies of the CPS investigators and nurse examiners regarding their concerns about how respondent's behavior could affect the children.

To summarize, the evidence regarding the concerns about respondent's mental health, decision-making, and the children's well-being is as follows: Respondent made repeated and unsubstantiated claims that the children were being sexually abused by their father and his relatives, despite examinations, interviews, and a CPS investigation determining otherwise. Respondent repeatedly stated that the children were part of a sex-trafficking ring involving their father, CPS, and GRPD, and she called the FBI because of this belief. Respondent posted over 100 TikTok videos that contained claims that CPS, the trial court, various attorneys, and her mother were all corrupt and part of a conspiracy to paint her as mentally unwell and steal her inheritance, and respondent made similar claims while testifying at the adjudication trial. CPS investigator Knapp testified that she was concerned that respondent's beliefs affected her ability to make "correct and safe decisions for her children." Respondent's inability to make such decisions was also evidenced by her refusal to comply with the 50/50 custody order, as respondent refused to give the children to their father and unilaterally decided not to attend therapy, which was also required by the custody order. Knapp and a nurse examiner both testified that respondent's

reactions were not typical and instead raised mental-health concerns. When the children were removed, respondent yelled and became aggressive, i.e., physically fighting the officers to the point that she was arrested, while the children were able to see and hear the situation. Respondent's reaction to the children's removal caused the children to become upset, three-year-old RSB apologized and indicated that she was to blame for respondent's actions, and JSB began to mimic RSB's statement that it was "all my fault." Finally, respondent was exhibiting the same mental-health concerns that previously led to her children's removal.

Respondent asserts that the trial court disregarded the evidence before it when it found that her mental health posed a risk to the children. But respondent's position essentially boils down to a disagreement with the trial court's weighing of the evidence. In particular, respondent argues that the testimonies about the concerns regarding respondent's mental health were not more convincing than (1) evidence that respondent was never diagnosed with a mental-health disorder, (2) evidence that respondent's reactions were typical of someone in the same situations, and (3) a lack of evidence presented that indicated that the children faced an ongoing risk to their physical or mental well-being because of respondent's actions. We address each in turn.

First, respondent argues that the trial court improperly disregarded the evidence that respondent was not diagnosed with a mental-health disorder. Specifically, respondent relies on the results of her psychological evaluation that did not indicate that respondent was diagnosed with a specific mental-health disorder. Although respondent is correct that her psychological evaluation did not indicate that she had any specific mental-health diagnosis, the evaluation also indicated concern that "there may be some mental illness operating," but respondent was guarded during the evaluation and "did not provide a cluster of symptoms to substantiate the diagnosis of a mental illness." Accordingly, despite the absence of a diagnosis for a specific mental-health disorder, the results of respondent's psychological evaluation corroborate the testimonies of the CPS investigators and nurse examiners that respondent's actions raised mental-health concerns.

Moreover, whether a parent is diagnosed with a mental-health disorder is not dispositive of whether a trial court can exercise jurisdiction over the children; rather, the trial court's primary concern is whether and how the parent's mental health affects the children. See *Kellogg*, 331 Mich App at 256; see also *In re Utrera*, 281 Mich App 1, 23-24; 761 NW2d 253 (2008). In other words, a parent that is diagnosed with a mental-health disorder is not automatically *unable* to parent, and a parent not diagnosed with a mental-health disorder is not automatically *able* to parent. See *Kellogg*, 331 Mich App at 256; see also *Kuebler v Kuebler*, 346 Mich App 633, 676 n 21; 13 NW3d 339 (2023) (stating that "a particular mental-health diagnosis, or lack thereof, does not necessarily make a parent inherently fit or unfit to see [their] own children") (cleaned up). Therefore, in this case, the fact that respondent had not been diagnosed with a specific mental-health disorder does not automatically eliminate any substantial risk of harm posed to the children's mental well-being.

Instead, as discussed, there was significant evidence that respondent's unsubstantiated beliefs and actions because of those beliefs posed a substantial risk of harm to the children's well-being. Accordingly, the fact that respondent had not been diagnosed with a specific mental-health disorder is unavailing because it was her actions that posed the risk, not the fact that she may or may not have a mental-health disorder.

Second, respondent argues that her reactions were reasonable and to be expected considering that she was experiencing her children being removed and was concerned that her children were sexually abused. Even if some of respondent's reactions, such as to the unannounced removal of her children from her home, could be described as typical of a parent in that situation, the weight of the evidence preponderated toward reactions that suggested mental-health issues that could affect her parenting. As discussed earlier, one of the nurse examiners and Knapp both testified that respondent's reactions were atypical and caused them to have concerns regarding respondent's mental health. Notably, the nurse examiner was not convinced that respondent had the capacity to consent to the examination of her children because of respondent's actions. The trial court did not clearly err by crediting the testimonies of service providers at the hearing, as we defer to the trial court's assessment of witness credibility. See *Kellogg*, 331 Mich App at 253. And as noted by the trial court, it was not only respondent's reactions to certain situations that indicated a mental-health concern, but it was also the culmination of respondent's unsubstantiated beliefs of sexual abuse, trafficking, corruption, and conspiracy to steal her inheritance and her other actions like calling the FBI that also indicated mental-health concerns that could in turn affect her children.

Lastly, respondent argues that there was no evidence presented that indicated that the children were harmed by respondent's "emotional response[s]" or that the children were being physically neglected or abused. As an initial matter, as the trial court observed, physical harm or neglect was not at issue. Rather, there was significant evidence that respondent's actions posed a substantial risk of harm to the children's *mental* well-being. Notably, the record indicates that respondent had unilaterally stopped going to therapy despite therapy being a requirement under the custody order, that respondent stood by her decision to discontinue therapy, and that respondent was exhibiting the same beliefs and mental-health concerns that had originally led to the removal of her children. These facts support a reasonable inference that the children's mental well-being was at risk of harm because respondent had taken no steps to address the concerns regarding her mental health that had led to the removal of her children the first time. In fact, respondent did the opposite by continuing to deny concerns about her mental health and doubling down on her unsubstantiated beliefs of sexual abuse, corruption, trafficking, and stolen inheritance. Further, the children's reactions after respondent's actions during the second removal support the determination that the children's mental well-being was not only already harmed but also at a *substantial* risk of further harm because respondent's actions resulted in three-year-old RSB apologizing and believing that she was to blame. Cf. *Kellogg*, 331 Mich App at 256-258.

In sum, the trial court did not err by exercising jurisdiction under MCL 712A.2(b)(1) after finding by a preponderance of the evidence that respondent posed a "substantial risk of harm to [the children's] mental well-being." See *In re Ferranti*, 504 Mich at 15.

Affirmed.

/s/ Mark T. Boonstra
/s/ Adrienne N. Young
/s/ Daniel S. Korobkin